Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. All right, it's still morning here, so good morning, everybody. Good morning, Your Honor. We're ready to hear argument in our final case this morning, Ethiopis v. Barr. And Mr. Baluwarte, whenever you're ready, sir. Thank you, Your Honors, and may it please the Court. My name is David Baluwarte, and I represent Miliyon Ethiopis in this petition for review. In the seminal citizenship case Trot v. Dulles, former Chief Justice Earl Warren of the U.S. Supreme Court described nationality as nothing less than the right to have rights. He went on to characterize the absence of nationality, known as statelessness, as a status abhorred by the civilized world. And in recognizing the centrality of the right to nationality, Chief Justice Warren went on to describe denationalization as a punishment more primitive than torture. In his 2018 motion to reopen to the Board of Immigration Appeals, Miliyon Ethiopis provided evidence that Ethiopia had discriminatorily denationalized him and left him stateless in 2011. He argued that this was new and previously unavailable evidence of a change. Yes, Your Honor. What about the fact that the Ethiopian government confiscated his passport in 2001? Would that not have constituted denationalization? And how does that impact your argument? It would not constitute denationalization, Your Honor. The difference in refusing to issue Miliyon a passport while he was still in Ethiopia was a security measure to make sure he did not travel. That's different than denying his passport when he is outside of the country of nationality as that effectively revokes his right to return to his country of nationality. Moreover, in the 2011 incident in the Ethiopian embassy, the consular official said that it was denying the passport because he was Eritrean and not Ethiopian. That exchange did not take place with the original passport denial, Your Honor. Miliyon argued to the Board of Immigration Appeals that he had presented previously unavailable evidence that Ethiopia discriminatorily denationalized him in 2011 and that was a change in circumstances. Yes, Your Honor. I'm sorry. Can I ask you a question about just the timing on this, which is always confusing to me? So, if the denationalization happened in 2011, or at least that's the best evidence at the embassy, that evidence was unavailable in 2003 at the IJ hearing, but it was available for the first motion to reopen, right? Some of that evidence was available. The UNHCR statelessness determination was new evidence. But the fact of denationalization happened before the first motion to reopen, and then on your own account, and it's important to your argument, it wasn't raised in that first motion and it wasn't passed on by the BIA. But that's okay? That's not a problem? You're allowed to file successive motions to reopen based on evidence that would have been available for the first one? Your Honor, indeed we are. The plain language of the relevant regulation, 8 CFR 1003.2 C32, clearly provides that the inquiry into changed circumstances for purposes of reopening an asylum claim should always compare the new evidence to the circumstances at the time of the immigration court hearing. Yes, Your Honor? But aren't the changed circumstances that it's talking about changed country conditions, not changed claims? That's what I think you're trying to do here, is to change the claim. Your Honor, Milian's discriminatory denationalization and his resulting statelessness do constitute a change in circumstances in Ethiopia. It was a sovereign decision by Ethiopia to strip his nationality, and in so doing, it removed Milian from the citizenry of Ethiopia. But as Judge Harris pointed out, that was available before. Not at the time of his 2003 hearing, Your Honor. At the time of his 2003 hearing, there was no claim of denationalization and no claim of statelessness. Right. He could not have claimed it, or he didn't claim it? He did not and could not have claimed it in 2003. And he couldn't claim it in 2003 because it hadn't occurred yet? That is absolutely right, Your Honor. And in 2011, in the motion to reopen in 2011, he could have but did not claim it? That's correct, Your Honor. In 2011, his counsel at the time referred to a change in the law pointing to the Third Circuit and the Seventh Circuit that had found discriminatory denationalization does constitute a basis for asylum. But at the time, he simply asked as a sua suponte motion to reopen for the board to exercise its discretion to reopen. That's different than the case before this court today. Right. So you're... Go ahead. No, you go ahead, Judge Diaz. So just sort of following up on Judge Harris's question, which is what has concerned me about this case, you affirmatively asserted that the regulations seem to contemplate a petitioner being able to sort of trot out claims piecemeal. That is, even if he or she is aware of a particular basis for branding relief, as it appears you concede the denationalization claim seemed to have reared its head in 2011, right before the first motion to reopen. You seem to be saying that it doesn't matter. A petitioner can simply, if he fails this one time, just file another motion to reopen alleging a different claim, even if he or she understood and had all the evidence available and could have litigated that issue in the first motion to reopen. That seems a little strange. I mean, in civil litigation, for example, if you do that, you're collaterally a stop from raising claims that you either could or should have brought in earlier litigation. What is it about the immigration context that makes it different? Your Honor, for starters, the regulation that I cited earlier is the Department of Justice's interpretation of its statutory authority to reopen asylum claims. And so it's significant that the Department of Justice has interpreted its reopening authority to have it focus on the underlying hearing as the point for comparing the circumstances. Moreover, the BIA has consistently found this to be the case in its own published decisions. In particular, in matter of SYG, which Millian relied on in his brief, that case involved Shu-Yung Guo's third motion to reopen, and it was on remand from the Second Circuit. And in matter of SYG, the BIA did not look at the evidence provided in the first and second motions to reopen. Rather, the BIA focused on the country conditions at the time of the hearing. This is how the regulation has been routinely applied. But are you saying that in that case, the petitioner could have brought the claim in those earlier motions to reopen but chose not to and instead filed a third motion to reopen and the BIA said that that was okay? That is absolutely right, Your Honor. That case involved a family planning claim by a Chinese national, and that individual had brought a claim twice before in motions to reopen that by having children in violation of the one-child policy in China that they had violated family planning laws in China. And with each motion to reopen, that petitioner provided additional evidence of the circumstances in China that would have validated the asylum claim. Now, importantly, in matter of SYG, the BIA focused on the new evidence provided and compared it to the evidence at the hearing. That is the appropriate comparison for a motion to reopen. Your Honor, in— And in fact, at the hearing, as I recall, at least of the findings that the judge made, the immigration judge found that he, in fact, was a national and citizen of Ethiopia, right? So there was no finding or no concern about denationalization back then. That's correct, Your Honor. The immigration judge found that Milian was a citizen and national of Ethiopia. The immigration judge further found that Milian did not fear expulsion from Ethiopia because he was only half Eritrean. His mother is a Romo, which is another persecuted minority in Ethiopia. And the immigration judge found that significant. Moreover, in reviewing pages 720 to 920 of the administrative record, which include all of the transcripts of the hearings and the judge's oral decision, there's no mention of denationalization or any of its synonyms, expatriation, nationality stripping. It simply was not an issue at the initial hearing. And most importantly, Milian was considered a citizen and a national at the time. Yes, Your Honor. A question, and you can tell me how this lines up with the SYG case. So we have a case in the Fourth Circuit, the Lynn case, where we held that when there's a second motion to reopen, and this may be what you're saying too, you look at the new evidence that became available and where the claim is the same. You look at the new evidence that became available since the first motion to reopen, and you compare that to what was going on at the time of the hearing to consider whether there's been a change in country circumstances. But you don't look at evidence that's already been provided in the first motion to reopen. Is that a problem for you? That is not a problem for me, Your Honor. That's how I believe the regulation has been written and interpreted consistently by the BIA. But then it seems like it would follow that what the board was supposed to look at here was what it did look at, which is the 2017 UN declaration, because that's new. That was not available in 2011. So they should look at that, but they shouldn't go back and look at the things that happened before 2011? Your Honor, I'm sorry. I believe that the board had to consider the new evidence as compared to the evidence provided in 2003. I recognize that there is some overlap between Milian's first motion to reopen and his second motion to reopen. I also think that there are important differences, but I think most important is that the regulation and the BIA's interpretation require the comparison of the new evidence provided with the second motion to reopen and the hearing. I'd like to dig in a little bit to the UNHCR statelessness determination that Your Honor just mentioned, because I think that one of the key abuses of discretion committed by the BIA here was to characterize that statelessness determination as a change in personal circumstances. The BIA abused its discretion when it misapplied its own precedent on changed circumstances and erroneously found that Milian's statelessness determination was a change in personal circumstances. This circuit has held in Macis v. Mukasey that the BIA abuses its discretion when it makes a decision contrary to the law. Under matter of CWL, relied upon by the BIA in this case, a change in personal circumstances does not qualify as a change in circumstances in the country of nationality for purposes of reopening an asylum case. That rule of law, however, emerged from a very specific set of facts that I actually referred to before in matter of SYG, and that is a Chinese national having children in excess of the purported one-child policy in China. U.S. Circuit Courts of Appeal have agreed with the BIA's distinction between changed personal circumstances and changed circumstances in the country of nationality, but have emphasized that this should be limited to self-induced change. Indeed, the Third Circuit in Mohammed Saoud Khan found that a key aspect of a change in personal circumstances is that the applicant chooses to make the change. Similarly, yes, Your Honor. So, and I find this case very confusing, and I appreciate all the help in clarifying it. Just procedurally, it's so messy. And what I understood the BIA to be saying here was, look, the only thing we're looking at is new evidence since 2011. So we're not going to look at what happened at the embassy, at the denationalization itself. The only thing that's properly in front of us is this declaration of statelessness, and that by itself, if you take, that by itself doesn't change anything about the world. That's just your client, on his own initiative, went and got this declaration of a thing that was already true back in 2011. And if you look at it that way, if you sort of separate it from the denationalization itself, and this is just a petitioner going out and getting a declaration, then it is more like a change in personal circumstances, isn't it? I mean, you think they should have been looking at the denationalization itself from 2011. But if they weren't looking at that, if you were just looking at this declaration in isolation, by itself it wouldn't have changed country conditions, would it? Well, Your Honor, I think that we offered the statelessness determination as evidence that Millian was in fact stateless. And that is an important change in circumstances. In fact, it's the crux of our argument for why Millian qualifies for reopening. The statelessness itself, not the declaration. Absolutely. But the evidence of his statelessness was key. And in finding that it was a change in personal circumstances, the BIA committed a legal error because it misunderstood the nature of the denationalization and the statelessness that resulted. The denationalization was completely within the power of Ethiopia. It was a sovereign decision to discriminatorily make the pronouncement that Millian was Eritrean, not Ethiopian. And in so doing, it removed Millian from the Ethiopian citizenry. And that is a change in circumstances in the country of nationality. Yes, Your Honor. And I'm with Judge Harris because this is just really confusing. But that occurred back in 2011, right? Yes, Your Honor. All this does is sort of bolster the fact of his statelessness, which occurred back in 2011. And if Judge Harris is correct, the BIA wasn't required to consider that old evidence but simply focus on the new evidence, why couldn't they conclude that there's nothing new here? We've got a petitioner who is stateless now. He was stateless back in 2011. We denied that request for relief back then. I don't think you were involved, but the case made its way up through our court and we affirmed rightly or wrongly. But why are we litigating the same claim again? Your Honor, I see that my time has elapsed. May I answer the question before I conclude? I hope you would. Thank you, Your Honor. So importantly, Your Honor, what happened in the first motion to reopen was very different than the claim that we're advancing right now. The original motion to reopen simply stated that Millian had been denied his passport, denationalized, and that therefore, as an act of discretion, the board should reopen. It was never considered whether the discriminatory denationalization and the resulting statelessness constituted a change in circumstances in the country of nationality. The board was under the... I'm sorry, Mr. Baloarte, but who had the obligation to frame the claim in that way? You say it was being framed as the BIA being asked to exercise its discretion, but that was at the request of the petitioner, right? The petitioner could have said, could have made the claim that you're making now back then and framed it that way, but he didn't. So then, why are we now... Why is he now allowed to now reframe the claim as you would like us to do here today? Your Honor, because the evidence of statelessness is now clear. The evidence of statelessness relates not only to Ethiopia's denial to let Millian exercise his right of return to Ethiopia, but also the analysis of his right to Eritrean nationality in Eritrea. And that's what the UNHCR did in performing a statelessness determination. It declared that Millian was not a national of any country under the operation of its laws and therefore an internationally protected person. Yes, Your Honor. But did you need that declaration to make that claim in 2011 of denationalization? I thought you had... It seems to me that the record evidence was sufficient to pursue the claim back then, given what the Ethiopian government had done to the petitioner back in 2011. I think, importantly, Your Honor, the claim was not pursued. And I think that has at least in part to do with the fact that the situation was not clear at the time that Millian was stateless, as it is abundantly clear now. And importantly, Your Honor, I want to reemphasize that the relevant comparison is the evidence provided, the psychological evaluation that shows Millian's personal suffering from his stateless status and the UNHCR's determination that he was in fact stateless. That is what the board was under the obligation to consider with the situation in 2003. And in failing to do so, it abused its discretion. Your Honor, may I just conclude briefly? Go ahead. If this court concludes that the BIA's various errors prevented the BIA from meaningfully addressing Millian's primary argument for reopening, then the appropriate course is to remand to the BIA to address this argument in the first instance. If the court finds legal error that the BIA misapplied its law on changed personal circumstances, this court may substitute its legal judgment for that of the BIA. And in that case, this court should find that Millian did demonstrate changed circumstances in Ethiopia under 8 CFR 1003.2C32, and it should remand to the BIA with an order to reopen and remand to the immigration judge for taking of new evidence. Thank you, Your Honors. Thank you. Mr. Hardy, we'll hear from you. All right. Thank you, Judge Diaz. Good morning, Dean Palomarte. And may it please the Court, Joseph Hardy for the Attorney General. I will venture to unpack the confusion in this case for you all. First of all, let me start off with what's not before the Court, if anything. Petitioner concedes in his reply brief on page 14 that as far as prima facie eligibility for asylum and withholding of removal and for protection under the CAT, he's not challenging the Board's decision to the extent that it says that the State of Emergency Declaration in 2017 occurred because there was a 2018 rescission of that. So that's not before the Court. And while he is challenging the Board's rejection of the citizenship issue or the denationalization issue, he appears to misunderstand what the Board did here. The Board did not hold that the 2017 U.N. document, that it could not establish his prima facie eligibility for it. The Board only says that that document by itself constituted a change in his personal circumstances, not a change in the country of removal. And so the Board's decision was correct in that regard. And I would first point out, and I don't want to just rehash the brief, so actually, as far as that 2017 document, that's the thing that he is saying is a change as far as his current motion. And the U.N. has no relation, for one, the U.N. Regional Office for the United Nations High Commission on Refugees is here in Washington, D.C. It's not in Ethiopia, so it's not a change in country conditions. Also, as he says in his motion to reopen, the United Nations is an independent body. It's not related to the Ethiopian government. I mean, you could say that, or you would say that the embassy situation in 2011, obviously, that is a sovereign Ethiopian territory. So that potentially could have been a change in country conditions. The problem with that is that he is just using that 2017 U.N. document. He doesn't directly challenge the board's determination that it's a change in his personal circumstances. He's using that as a red herring, or as a Trojan horse, as a way to be able to get this court to take a second look at that 2011 interaction with the Ethiopian embassy. And the court has already ruled on this document. I know Petitioner says that the board did not rule on it, that the court in 2013 did not rule on it, but Petitioner specifically raised that document in his 2011 motion, and the board rejected it. He's saying that the nationalization... Judge Harris, yes. Let me ask you something. Just assume for a minute that I disagree with you that the BIA passed, in its denial of the first motion to reopen, just assume for a minute that I don't actually think the denationalization issue was squarely presented as a change country condition, and I don't think the BIA passed on that either. Okay. But I think it could have been raised, and the BIA could have been given an opportunity to pass on it, and it wasn't. If it wasn't passed on, but it could have been raised and passed on, what happens then? Do you see what I'm saying? Yes, I do, and there's a point in the brief where I point out, and I believe, I don't remember if it's Judge Thacker or Judge Diaz said earlier, the regulation and the statute for motions to reopen, it doesn't care about what your claim is in 2003, versus 2018 when he filed the motion. They specifically want to see a change in country conditions, so the fact that it wasn't, or that you may view it that the board did not pass, or that he didn't raise it, or that the board didn't pass on it in 2011, that's irrelevant. The evidence was there at the time, and so the reason why I bring up saying that that was raised in the 2011 thing, and if I may, looking at the affidavit that was attached to that first motion, in paragraph 6, that's on page 230, he specifically says, I cannot, this is the affidavit, I'm sorry, the alien's affidavit that was attached to that motion. I cannot go to Ethiopia because I would face severe problems there. My Ethiopian citizenship was taken away from me because of my Eritrean ethnicity. The Ethiopian government still, yes? I'm sorry, I just want to try to save you some time. I agree that there are allusions in that brief to denationalization, but it's not presented. The argument is not, there's been a change of country circumstances based on my denationalization, and the BIA appropriately doesn't address that argument. It says that to the extent he's relying on circumstances at all, he can't show it, because the general treatment of ethnic Eritreans has not changed, and it doesn't really address what impact, if any, his individual denationalization might have. So just assume for a minute, as I understand the petitioner's claim, he's saying, look, the changed circumstance I am pointing to is my individual denationalization, and the BIA in this proceeding has never considered whether that could count as a change in country circumstances. And then he concedes, I could have raised this in 2011, but I didn't, but he looks at the regulation, and says, I didn't have to raise it then. What the regulation requires is that I'm relying on evidence that's material and was not available and could not have been presented at the previous hearing, and everybody agrees that means the IJ hearing in 2003. So what's the problem? I have a claim. It's never been, it is different than it was in 2003, and it's never been addressed by the BIA. Why can't I bring it in a second motion to reopen? Why can't I? Excuse me. As Judge Diaz says, in immigration law, he is collaterally stopped from bringing something that it is the government's position that he did raise it, and I think the part that I did not get to as far as that, he says that it does not recognize me as its citizen as confirmed by the actions of the embassy in Washington, D.C., and I think you have to unpack that by looking at the board's decision. I know the language that you just read, but the board is addressing that to the extent it says in that first decision. In fact, the 2010 Department of State Human Rights Report for Ethiopia states that in October, the Ethiopian government announced a new policy that allows exiled Eritreans living in Ethiopia to become legal permanent residents of Ethiopia with full entitlement to public service, and they point out that somewhere in this decision, they point out that the mother and the siblings are still residing there, notwithstanding the fact that they are not or apparently are not Ethiopian citizens. So the board does get to the citizenship issue, and it recognizes that his claim that he has been denationalized. Okay. So your answer to me is my concern is purely hypothetical. In this case, the BIA did reject a claim that an individual denationalization can constitute a change in country circumstances. But I guess I would like you to answer my hypothetical question. If I thought the BIA had not squarely addressed and rejected that claim, is there any reason why the petitioner can't bring it now after he has already filed, you know, in a second motion to reopen? Is there any bar on successive motions to reopen in these regulations? Because I actually don't see one, which surprises me. Yes, there absolutely is. And I think the issue is that Dean Balawarte has you looking at the regs and not the statute itself. If you look at 8 U.S.C. I don't know if you have this statute, but I'll say it out loud. 8 U.S.C. section 1252 D2, right? And I'll read it for the record. A court may review a final order of removal only if another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy, you don't really need that last part, or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order. So it's a collateral estoppel rule. It's a jurisdictional rule. It was written directly into the statute. That prevents you from revisiting your... Judge Diaz, I do believe you are on that 2013 panel that decided or that affirmed the board's decision on the basis that the board provided in its decision. And I know, I believe that's in the record, but I'll just point out that that 2013 decision was 509 Federal Appendix 252. So the court basically... Yes, please. If I may, I'm sorry. So you pointed us to the statute, but I think by its terms, it appears to be limited to courts, not the ability of a petitioner to re-litigate claims within the BIA. Am I missing something there? And then there's also, I believe, 8 U.S.C., is it 1158 maybe A2D? It prevents successive asylum applications. I don't have it in front of me, but we'll look at it. Okay. And if I have that site wrong, I'm sorry, I'm just thinking off the top of my head. Let me just follow up. So you recited the affidavit, which did seem to place the issue of denationalization squarely before the BIA in 2011. Now, it may be that the BIA made an error of law in not addressing that issue. Of course, that was an issue that could have been brought to our attention in the appeal of that order. I don't recall that it was. And if it wasn't, that would seem to fall squarely on the petitioner's shoulders, not the government's, and would at this point seem to foreclose re-litigating that same issue here today. So, does that make sense? I think we're thinking the same thing. I don't know if I say yes, does it mean? The point I'm getting at is I am concerned, as is Judge Harris, I mean, this is an important claim, obviously, and counsel for the petitioner began by reciting the horrendous consequences that ensue when someone is denationalized, and we all agree that that's important. But it's also, I think, important that the processes and procedure be followed. And I've just been struggling with this case, because if you, as petitioner seems to concede, the claim was ripe for adjudication back in 2011, one of two things happened. Either it was squarely presented and the BIA wrongly refused to rule on it, but then that went up to us and we affirmed that ruling, which appears to suggest that the claim is now barred as a result of res judicata. Or, as Judge Harris indicated, the claim was never fairly presented back in 2011, and therefore the BIA had no occasion to rule on it. And then that begs the question as to whether or not under these regs, the petitioner is then free to file another motion to reopen based on his alleged denationalization. So that's the issue that we're struggling with here. So, if I may, and so petitioner is correct, the reg itself and the statute, it goes to whether there was a change in country conditions, again I can't emphasize the country conditions part enough, since the June 2003 hearing. And so, if I may go back to that, I know while counsel now wants to say that evidence wasn't in the record at the time, I believe the argument is that in 2003 he says they just didn't give him a passport because they didn't want him to leave. His client seems to say otherwise. His client specifically says, if I may, and I can just go backwards in the record, and on paragraph 29, which is page 50 of the record, that's the declaration that he submitted with this one, he's talking about realizing I was stateless. And on paragraph 29 he says, first I thought back to the confiscation of my passport in Ethiopia when I sought an exit permit after my detention in 2001. The government left me without any identification document. And there's all these instances in the record, if you go back and look at the declaration that he submitted at the 2011 motion, and excuse me, he said, I think I had read that a little while ago, he specifically says that the Ethiopian government still does not recognize me as a citizen as confirmed by the actions of the embassy in Washington, D.C. So petitioner himself recognized that back in 2001, the Ethiopian government didn't recognize him then. What happened in 2011 is just a carry-on of what the Ethiopian government had already been doing in 2001. And if you look at the... Because you're saying that even in 2003 he characterized himself as stateless as a result of what happened with the passport in 2001. That is correct. So if you look at page... I'm just trying to give you sites to help down the road. He says that... He doesn't say that he didn't get it because they were trying to keep him from leaving the country. He says on page... Let's see... 844 that they took it and they said something about because he was Eritrean. And then you look on page 850, he says the same thing again. But the second time by using the Kibeli identification card, I went and asked them again. But they refused again because of my ethnic group and a lot of things. But they didn't tell me as why they denied me at that time. And then in his declaration, he specifically says it was arbitrarily confiscated. That's on page 935, paragraph 16. He says the same on 937, paragraph 21. And then there's a supplemental declaration on page 942, paragraph 13. He's saying that's odd, not because they were trying to keep him from leaving. He recognized like a... I mean, I think the most direct citation for that would be the affidavit. And that's related to the... Judge Harris. Yes, please. I am so sorry. Judge Diaz, may I ask for just one minute? It's literally raining inside my office and I just want to put a pot or something. Absolutely, yeah. Well, thank you. I really apologize. It's also making a huge racket, so I can't hear anything. Go ahead, Mr. Hardy. That's pretty much how I feel about my virtual connection that our good DOJ has given me. I know how you feel. And yeah, so the... I think you were saying that that continues in his 2011 claim in his affidavit there where at JA 229, he twice talks about how the embassy had told him he's not considered Ethiopian. Because of his Eritrean ethnicity. He said nothing about, well, we're trying to keep you here in the country, as petitioner is attempting to claim now. And so the point of that all is to say that this is not a change in country conditions. He had been denationalized at least from that 2001 when they confiscated the passport. And he went back a second time, just like he tried to do in 2011 to get his passport from the embassy. And each time they both told him, you can't get this passport because you are Eritrean. I guess through his father. His mother is ethnic Oromo. But if you look at the... Again, if you look at the IJ's decision in 2003, yes, the main part of his claim back in 2003 was that they had taken everything away as related to his father. At some point, I think in 2001, he went to complain about how his father had been treated back in 98. And he was thrown in jail. When he got out, his mother told him you should leave the country. He tried to go renew his passport. They said, oh, you can't get this passport because of your Eritrean ethnicity. These facts were already in the record regardless of how petitioner at the time construed his claim. And so the statute, 8 U.S.C. 1229A, C7, I believe one or two, I'm sorry. It specifically and the regulation, they specifically are concerned with what was the evidence at the time versus what is the evidence now. And if you look, and the other thing is simply the fact that petitioner went to the embassy in 2011, it doesn't mean that that evidence was previously unavailable before. If you look at the regulation, the language specifically says, a motion to reopen, a motion to reopen proceeding shall not be granted unless it appears to the board that evidence sought to be offered as material and was not available, this is the key language here, and could not have been discovered or presented at the former hearing. So petitioner hasn't presented any evidence that says he couldn't have gone to the Ethiopian embassy in Washington, D.C. somewhere around 2003 or earlier and have been told the same thing, that you can't get a passport because you are of Eritrean descent. And so the last thing that was in the record, and I see the time is ticking down, is the fact that the 2017 document was a change in its personal circumstances and the fact that both documents, even if you consider the 2011 one was not a material change, those affect the board's decision to the effect that it also says that he couldn't get, that he wouldn't be able to establish changes as far as protection under the cat, but the board also goes on to point out that you can't establish prima facie eligibility for those because you didn't establish, one, that the government would learn of that 2017 document, much less that the government would have any interest in torturing you because. And if you look at, and I see the time has passed, if you look at the petitioner's brief between pages 27 and 29, that's the only area where he talks about the denial of the motion as it relates to cat, and nowhere in there does he discuss any evidence in the record that would suggest that the Ethiopian government would learn of what's happened here as far as that 2017 document or that the government would be interested in torturing him, even assuming that denationalization itself could be considered torture. It would be the government's position that it couldn't be, but unless there are any questions, I will conclude. All right, thank you very much, Mr. Hardy. All right, thank you. Mr. Bellavarte, you've got some time for rebuttal. Excellent, Your Honor. I'd like to make three points in rebuttal. The first was my opposing counsel cited the statute as support for the idea that this court may consider the evidence in the first motion to reopen. However, that is not how the Department of Justice has interpreted that statute. The Department of Justice's interpretation of that statute is found in the regulations that govern motions to reopen asylum claims, and that's 1003C32, and that clearly refers to the hearing. Now, I believe my opposing counsel on some level recognizes that, and so he goes on to argue that Millian was actually stateless in the 2003 hearing, but there simply is not adequate evidence to support that. In fact, on balance, all of the evidence suggests the contrary. The immigration judge had to determine Millian's nationality. It's an immigration hearing, and more importantly, it was an asylum hearing, and so if Millian was indeed stateless at the time, a different substantive standard applies to his asylum application. So the IJ's factual finding that Millian was a citizen and national in 2003 had legal significance. Moreover, Millian described the incident of being denied a passport and provided the explanation perhaps they did that because of his ethnicity. Now, Millian is a member of two marginalized and oppressed ethnic groups. Eritrean and Oromo, and both at the time that Millian was seeking his passport, both were persecuted because they were believed by Ethiopia to present a national security risk. If Ethiopia at the time had believed Millian to be stateless, it would have forcibly expelled him to Eritrea the same way it had done with 75,000 other ethnic Eritreans of Ethiopian nationality. But that is not what Ethiopia did. Ethiopia decided to not give him a travel document so that he couldn't leave the country, and then it proceeded to persecute him in-country. That is absolutely different than the denationalization claim and the resulting statelessness that he makes in 2011. The final point that I want to make, and this goes to Judge Diaz's question to my opposing counsel, this claim was absolutely not before the court in the last petition for review. The claim of denationalization that was originally raised was submitted purely to the sua sponte discretion of the Board of Immigration Appeals. It was jurisdictionally unable to then raise that claim here before the Fourth Circuit, and therefore this issue has never been before the court. This is the first time that the court should review this evidence, and the court should find that the BIA abused its discretion when it denied Millian's motion to reopen and remand for a new decision. Thank you, Your Honor. Thank you, Mr. Veloarte. We appreciate both counsel's arguments here this afternoon. We would typically come down from the bench and come greet you. We can't do that, obviously, given the circumstances, but nonetheless we want to thank you for being here and for rendering valuable assistance to the court in deciding this case, which is now under submission. Judge Harris, would you call me when you think you're ready to conference? You may have to deal with that issue in your chamber. I should call you, Judge? Yeah, just let me know when you're ready. Okay, yeah. Thank you very much. I apologize. I'll make some phone calls and then get right back to you. That'd be fine. All right. The court, I'd ask the clerk to adjourn the court. Thank you, Your Honor. This trial of the court stands adjourned. Dr. Guinness takes in his Honorable Court.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris